IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| ROBERT EARL CLAYBORNE JR., | ) | 8:15CV198 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MEMORANDUM |
| v. | ) | AND ORDER |
| | ) | |
| SCOTT FRAKES, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

    Robert Earl Clayborne, Jr., an inmate at the Tecumseh State Correctional Institution ("TSCI"), claims in this § 1983 action that the Director of the Nebraska Department of Correctional Services (Scott Frakes, identified in the Complaint as "Scott Franks"), the Warden of TSCI (Brian Gage), an officer at TSCI (Adam Crop), and two caseworkers at TSCI (Chelsea Guffrie and Paul Tompkins) violated his Eighth Amendment rights by failing to protect his safety during a prison riot that occurred at TSCI on May 10, 2015. The defendants, who are sued only in their individual capacities, have moved for summary judgment on the basis of qualified immunity. Their Motion for Summary Judgment (Filing No. 50) will be granted, and the plaintiff's action will be dismissed with prejudice.

### I. Standard of Review

    "A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion" Fed. R. Civ. P. 56(a).

In ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. See *Dancy v. Hyster Co.*, 127 F.3d 649, 652-53 (8th Cir. 1997). It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue; the court merely determines whether there is evidence creating a genuine issue for trial. See *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999).

The moving party bears the burden of showing there are no genuine issues of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. The burden then shifts to the nonmoving party, who "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)).

## II. Plaintiff's Procedural Objection

Clayborne has responded to the defendants' Motion for Summary Judgment by arguing that it was not filed in a timely manner. He points to a Memorandum and Order entered on April 22, 2016, in which the court granted the defendants a stay of discovery but directed them "to file a motion for summary judgment raising the issue of qualified immunity, either by itself or in conjunction with the exhaustion issue, within 21 days" (Filing No. 39 at CM/ECF p. 2). The defendants were advised that "[i]f such a motion is not filed within 21 days, the court will enter an order lifting the stay of discovery" (*Id.*).

The stay of discovery was in fact lifted by the court on June 23, 2016, after the defendants filed a Motion for Summary Judgment raising only the exhaustion issue (Filing No. 46). The current Motion was filed on August 12, 2016 (Filing No. 50).

Contrary to Clayborne's argument, the court's April 22, 2016 Memorandum and Order did not preclude the defendants from filing sequential motions for summary judgment on the issues of exhaustion and qualified immunity. The only consequence of the defendants' failure to raise the qualified immunity issue within 21 days was that Clayborne was permitted to conduct discovery. The current Motion is timely.

### III. Undisputed Facts[1]

In May 2015, Clayborne was assigned to a cell in Housing Unit #2 at TSCI. This housing unit holds inmates on protective custody status.

On May 10, 2015, Crop, Guffrie (referred to in the plaintiff's Complaint as "Guthrie"), and Tompkins were working in Housing Unit #2. On this day, an inmate disturbance occurred in which inmates gained control of the facility for several hours, started fires, assaulted inmates, and caused major property damage.

At the beginning of the disturbance, inmates started fires in Housing Unit #2 near the control center where staff were stationed. As a result of the smoke coming from the fires, staff had to leave the control center and retreat to an office in the lobby

---

[1] The defendants have complied with the court's local rule by including in their supporting brief (Filing No. 51 at CM/ECF pp. 1-3) "a separate statement of material facts about which the moving party contends there is no genuine issue to be tried and that entitles the moving party to judgment as a matter of law." NECivR 56.1(a)(1). Because Clayborne has not responded to the defendants' statement of material facts, which contains proper references to the record, all of the facts stated are deemed admitted. *See* NECivR 56.1(b)(1). (Although Clayborne appears pro se, he is "bound by and must comply with all local and federal procedural rules." NEGenR 1.3(g).)

area for safety. Prior to leaving the control center, staff placed the cell doors on "Group Access" which allows inmates to either stay in their cell or push a button which will open their cell door. At this time the inmates were instructed to evacuate their unit and go to the mini-yard for safety, and Specialty Teams were called in to regain control of the facility.[2]

At the time of the disturbance, TSCI met minimum staffing requirements by having employees work up to 16 hour shifts, having part time staff, having staff work overtime, and having staff from other prison facilities fill in if necessary. TSCI was not understaffed on May 10, 2015.

### IV. Qualified Immunity Standards

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Qualified immunity gives government officials breathing room to make reasonable but mistaken

---

[2] The foregoing statement of material facts is generally consistent the plaintiff's Complaint, in which Clayborne alleges that fire alarms sounded at around 4:00 p.m. on May 10, 2015, at which time he exited his cell; that he looked for staff so they could advise him as to where to go, but none could be found; that he exited Housing Unit #2 through what he believed to be the fire exit, but quickly returned inside because there were general-population inmates in the area; that he again looked for staff, this time to advise them that protective-custody inmates were "being mixed up" with general-population inmates, but no staff could be found; that at some point, he heard a voice over the intercom advising prisoners to go outside for safety; that no prison official came to his aid or the aid of the other protective-custody inmates until 11:00 p.m., when an emergency response team showed up and put a stop to the rioting; and that until such time, general-population inmates were entering the protective custody unit, starting fires, and committing acts of violence (Filing No. 1 at CM/ECF pp. 4-6). Clayborne claims the incident exacerbated his previously-diagnosed mental illnesses and caused him to suffer emotional distress and unspecified physical injuries (Filing No. 1 at CM/ECF pp. 6-7).

judgments, and protects all but the plainly incompetent or those who knowingly violate the law. Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244-45 (2012) (internal quotes and citations omitted).

"Determining the question of qualified immunity involves the following two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right; and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Santiago v. Blair*, 707 F.3d 984, 989 (8th Cir. 2013). Courts may address either prong of the analysis first, *Pearson v. Callahan,* 555 U.S. 223, 236 (2009), and "the defendants are entitled to qualified immunity unless the answer to both of these questions is yes." *McCaster v. Clausen,* 684 F.3d 740, 746 (8th Cir. 2012).

### V. Analysis

The court determined on initial review of the Complaint that Clayborne had stated a plausible Eighth Amendment claim by alleging that the defendants "waited six or seven hours to come to his assistance in the face of fires and rioting prisoners" (Filing No. 13 at CM/ECF p. 6). The defendants' evidence has now established, however, that Crop, Guffrie, and Tompkins were required for their own safety to evacuate the control center after of fires were started in Housing Unit #2, and that Specialty Teams were dispatched to the prison to quell the rioting. While Clayborne alleges that the Department of Corrections has been understaffed, the defendants' evidence also shows that TSCI's minimum staffing requirements were being met on May 10, 2015, when the riot broke out.

"The Eighth Amendment 'prohibits the infliction of cruel and unusual punishments on those convicted of crimes.'" *Nelson v. Corr. Med. Servs.*, 583 F.3d

522, 528 (8th Cir. 2009) (quoting *Wilson v. Seiter*, 501 U.S. 294, 296 (1991)). "In order to make out an Eighth Amendment violation "the offending conduct must be *wanton*." *Id.* (quoting *Wilson*, 501 U.S. at 302 (emphasis in the original)). "The word 'wanton[ ] does not have a fixed meaning' and its meaning in the Eighth Amendment context depends upon the circumstances in which the alleged violation occurs." *Id.* (quoting *Wilson*, 501 U.S. at 302). "In cases involving prison riots, for example, wantonness is demonstrated by acting 'maliciously and sadistically for the very purpose of causing harm.'" *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986)). "The Eighth Amendment standard for conditions of confinement and medical care ... is different, and the constitutional question in [such] case[s] is whether [the defendant] acted with 'deliberate indifference.'" *Id.* (citing *Wilson*, 501 U.S. at 303).

"It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause [of the Eighth Amendment], whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." *Whitley*, 475 U.S. at 319. "[P]rison administrators are charged with the responsibility of ensuring the safety of the prison staff, administrative personnel, and visitors, as well as the 'obligation to take reasonable measures to guarantee the safety of the inmates themselves.' In this setting, a deliberate indifference standard does not adequately capture the importance of such competing obligations, or convey the appropriate hesitancy to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance." *Id.* at 320 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).

"When the ever-present potential for violent confrontation and conflagration ripens into *actual* unrest and conflict, the admonition that a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators carries special weight." *Id.* at 321 (emphasis in original; internal quotations and citations omitted). "Prison administrators ... should be accorded wide-ranging deference in the

adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 321-22 (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)). "That deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline. It does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice." *Id.* at 322 (holding that prison officials were entitled to directed verdict on inmate's claim that his Eighth Amendment rights were violated when he was shot in the leg without prior verbal warning during prison riot).

Because there is no evidence that the defendants were deliberately indifferent to Clayborne's health and safety, let alone that they acted "maliciously and sadistically for the very purpose of causing harm" while the prison riot in progress, they are entitled to qualified immunity. Accordingly,

IT IS ORDERED:

1. The defendants' Motion for Summary Judgment (Filing No. 50) is granted, and the plaintiff's action is dismissed with prejudice.

2. Judgment shall be entered by separate document.

October 27, 2016.                BY THE COURT:

                                 s/ *Richard G. Kopf*
                                 Senior United States District Judge